**SO ORDERED.**

**SIGNED this 27 day of July, 2009.**



_____
                    **ROBERT E. NUGENT**
            **UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ROBERT WHARTON HOCH, II | ) | Case No. 08-13181 |
| FRANCESCA ELIZABETH HOCH, | ) | Chapter 13 |
| | ) | |
|          Debtors. | ) | |

**ORDER DENYING DEBTORS' MOTION
TO STRIP OFF JUNIOR MORTGAGE LIEN
OF AMERICAN GENERAL FINANCIAL SERVICES, INC.**

Debtors Robert and Francesca Hoch move to strip the second mortgage of American General Financial Services, Inc. ("American General") that encumbers their homestead.[1] They contend that their home lacks equity over and above the balance due on the first mortgage obligation as of the date of filing and that, therefore, the second mortgage cannot be the basis of an allowed secured

_____

[1] Dkt. 5.

1

claim notwithstanding the non-modification provisions of 11 U.S.C. § 1322(b)(2).[2] In other words, they contend that American General's second mortgage lien is wholly unsecured under § 506(a) and, therefore, that lien may be stripped.[3] American General contends the debtors' homestead has a value in excess of the first mortgage, thus its second mortgage lien enjoys complete protection from modification under § 1322(b)(2). The contest before the Court therefore revolves around the value of the homestead. If that value exceeds the amount of the first mortgage as of the date of the Hochs' petition, modification of the second mortgage would be forbidden and their motion must necessarily fail.

Jurisdiction

The Court has jurisdiction of this contested matter which is also a core proceeding.[4]

Facts

The parties stipulated to the following facts in the Pretrial Order.[5] The debtors own property

---

[2] All future references to "Section" or "§" refer to the Bankruptcy Code, Title 11 U.S.C. unless otherwise noted.

[3] *See Nobleman v. American Sav. Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) (Section 1322(b)(2) bars a debtor from modifying the rights of a creditor who has a claim secured only by the debtor's principal residence.); *Griffey v. U.S. Bank (In re Griffey)*, 335 B.R. 166 (10th Cir. BAP 2005) (anti-modification provision of Chapter 13, which prevents debtors from modifying rights of creditor whose claim is secured solely by interest in real property that is debtors' principal residence, does not protect second mortgagee with interest in residential property whose value did not exceed amount of prior debt); *In re Samala*, 295 B.R. 380 (Bankr. D. N.M. 2003) (collecting cases; majority of courts conclude that the anti-modification provision in § 1322(b)(2) does not apply to wholly unsecured creditors).

[4] 28 U.S.C. §§ 157(b)(2)(B), 157(b)(2)(L), and 1334.

[5] Dkt. 31. The parties stipulated into evidence a copy of the mortgages, promissory notes, appraisal reports, deposition transcripts of Goodson and Vanderweg, Chapter 13 Plan and Debtors' payment history.

off K-196 in Newton, Kansas that is their personal residence. American General has a mortgage on the residence of debtors which is a secured claim in bankruptcy and is a valid first mortgage lien on the real estate. The balance due on the first mortgage was $146,374.30 as of the date debtors filed bankruptcy. Debtors executed a promissory note dated July 30, 2007 to American General and the promissory note is a valid obligation of debtors.

Debtors executed a second mortgage on their residence to American General on July 30, 2007 and it was filed with the Harvey County, Kansas Register of Deeds on July 31, 2007. This is a valid second mortgage lien on the real estate.[6]

Christina S. Goodson and Martin Vanderweg are licensed real estate appraisers and qualified to offer testimony as to the valuation of real estate. The parties stipulated their appraisal reports into evidence. Goodson appraised the Hochs' homestead the value of $179,000 as of July 31, 2008.[7] Vanderweg appraised the Hochs' homestead the value of $140,000 as of October 28, 2008.[8]

The Court conducted an evidentiary hearing on June 17, 2009 at which the following additional facts were established.[9] The home and land sit on a 5 acre tract in Harvey County. Also

---

[6] It is unclear what the balance due on the second mortgage as of the date of filing is. Debtors' proposed Chapter 13 plan indicates the balance due on the second mortgage as of the date of filing bankruptcy is $20,049.00. Trustee's Exhibit A, Debtors' Chapter 13 Plan. American General indicated in the PTO, under its theory of recovery, that "[t]he balance due on second mortgage as of the date of filing Chapter 13 bankruptcy was $19,967.88."

[7] Debtors' Exhibit 5, Goodson's Appraisal Report.

[8] Debtors' Exhibit 6, Vanderweg's Appraisal Report.

[9] Debtors appeared by counsel Michael J. Studtmann; American General appeared by counsel Jay Sizemore, the Chapter 13 trustee appeared by counsel Christopher Micale. Franscesa Hoch, the parties' respective real estate appraiser, and two American General representatives testified. Along with the stipulated exhibits, copies of various loan applications (American General's Exhibits I, J, and K) were offered and admitted into evidence at trial.

3

on the tract is Mrs. Hoch's grandmother's homestead which is a small bungalow and a metal garage. At one time, this tract was part of a 360-acre tract that has been in Mrs. Hoch's family since the early 1900's. She and her husband elected to move back to Harvey County to look after her grandmother and, in 2005, they purchased and set up a manufactured home on the premises.

When the Hochs made their first application to American General in May of 2006, the property was valued at $170,000.[10] On the strength of that application, they borrowed some $145,000, secured by the first mortgage. In July of 2007, they sought additional financing of $20,000 to erect the outbuilding and do other improvements. The property was valued at that time at $178,000.[11] This application was granted and was the basis for the second mortgage they now seek to eliminate. As recently as July 23, 2008, the Hochs applied for additional credit from American General Finance and, in that application, represented that the value of the property was $179,000.[12] Mrs. Hoch testified that she had no reason to argue about that valuation because it worked in her favor in obtaining the requested financing. Ultimately, that loan never closed.

Both debtors and the creditor presented the testimony and expert reports of their appraisers. The conclusions of these experts as to the value of the debtors' homestead diverge widely, ranging from $140,000 to $179,000. In the 2008 tax year, the Harvey County Treasurer appraised their home for property taxes at $181,000. The Hochs filed this case on December 20, 2008.

Analysis

In order to strip off the second mortgage, the debtors have to prove by a preponderance of

---

[10] American General's Exhibit I, Hoch Loan Application dated 5/10/06.

[11] American General's Exhibit J, Hoch Loan Application dated 7/10/07.

[12] American General's Exhibit K, Hoch Loan Application dated 7/23/08.

4

the evidence that their home and land is worth less than $146,374.30, the amount of the first mortgage.[13] In determining the value of the homestead property, the Court carefully considered the appraisal testimony of Martin Vanderweg, the debtor's witness, and Christina Goodson, the bank's witness. The Court also placed weight on Francesca Hoch's testimony that she accepted the $178,000 appraisal made by Ms. Goodson for the bank in July of 2008 because it furthered her endeavor of borrowing additional funds on the home and land. The Court recognizes that appraising real estate involves not only the application of historical value information, but also the use of careful judgment. In other words, appraisal is an inexact science. It is left to the trier of fact to determine which appraisal is better grounded both in fact and method based upon the Court's observation and evaluation of the witnesses and their respective reports.[14]

In comparing Mr. Vanderweg's $140,000 report to Ms. Goodson's $179,000 report, many differences emerge. They range from the number of comparable sales reviewed to the kinds of forms each witness used. After careful scrutiny of the reports and the witness testimony, the Court believes that the important differences are in the areas of (1) the purported "illegal use" of the ground by

---

[13] *See* 4 Collier on Bankruptcy ¶ 506.03[9] at 506-94.1 (15th ed. rev.) (burden of proof for a valuation proceeding depends on the circumstances); *Young v. Camelot Homes, Inc. (In re Young)*, 390 B.R. 480 (Bankr. D. Me. 2008) (The circumstances dictate the assignment of the burden of proof on the question of value. Chapter 13 debtors bore burden of proving value of collateral when debtors sought confirmation of their plans.); *Weichy v. Nextier Bank, N.A. (In re Weichey)*, 405 B.R. 158 (Bankr. W. D. Pa. 2009)(debtor bears burden of proof on issue of valuation under § 506(a)). *But see In re Serda*, 395 B.R. 450 (Bankr. E. D. Cal. 2008)(Chapter 13 debtor bore initial burden of overcoming any presumption established by the stated value of her residence in mortgage lender's proof of claim, but lender bore ultimate burden of persuasion to demonstrate the value of collateral that secured its claim, and had to do so by preponderance of the evidence.).

[14] *In re Weichey*, 405 B.R. at 165 (courts are given wide latitude in determining value because the valuation of real property is less than exact science).

5

situating two dwellings on it; (2) presence or absence of a cost analysis; and (3) adjustments of value for sellers' concessions and a disputed "lake view." Each of these is addressed below.

Illegal Use

As noted above, the property consists of 5 acres in rural Harvey County, a manufactured home in which the Hoch family reside, a 1910-era bungalow in which the grandmother resides, and two outbuildings, one being a garage adjacent to the bungalow and the other being a pole shed erected by the Hochs in 2007. Vanderweg testified that he assessed $140,000 value to the entire tract and improvements. In reaching that conclusion, he testified on direct examination that he assessed a $20,000 value to the bungalow based on its square footage (about 900 square feet) and likely rent of $200 per month. He also noted that the bungalow's presence on the five-acre tract detracted from the value of the subject property as a whole because Harvey County's zoning ordinance prohibits multiple dwellings on smaller tracts. He also stated that the existence of the questionable use would make securing financing more difficult.

On cross examination, Vanderweg stated that if a zoning variance or special use permit were obtained, the bungalow would be worth $40,000. There was no evidence presented about the ordinances. Goodson testified that when she developed her report, she received information from the Harvey County authorities indicating that a building permit had been issued for the erection of the manufactured home. Vanderweg testified that he spoke with someone at the Harvey County zoning board who had no knowledge concerning the permit. He also testified that even if there were no permit, a special use permit could be obtained at a probable cost not exceeding $500. Viewed as a whole, Vanderweg's testimony concerning the bungalow suggests that he reduced the value of the subject property by $20,000 because of the illegal use issue. Whether or not the presence of the

6

two homes on the same tract constitutes an illegal use, the Court concludes that it either has been remedied by the building permit's issuance or could be for a nominal $500 fee. The Court concludes that the bungalow contributes $30,000 and that the illegal use deduction should be disregarded.

Cost

Goodson's report, made on the Uniform Manufactured Home Appraisal Report Form, contains a detailed cost analysis of the property in addition to comparable home sales. Typically, in this Court's experience, appraisal reports reference at least two of the three methods of valuation: cost, income, and comparable sales. Vanderweg's report addresses neither the cost nor income method and relies entirely on the comparable sales method.[15] Goodson testified that establishing the replacement cost of the subject property is necessary to establish a top value. It also assists the appraiser in "testing" the conclusions she may have reached using the other valuation methods. Determining what it would cost to build a substantially similar homestead is important because it is unlikely that a buyer would pay more than "creation cost" for an existing property. Here, Goodson used nationally available data from Marshall & Swift to establish a cost of the land, the bungalow, and the manufactured home of $182,184. This value, in turn, may validate her comparable sales value of $179,000. In any event, it suggests that Vanderweg's comparative sales value of $140,000 is some $42,000 below cost, a significant difference that opens his conclusion to further examination.

Adjustments to Comparable Sales

Goodson and Vanderweg used several of the same comparable sales (comps). This enables

---

[15] The Court does not expect to see the income method used in an owner-occupied single family setting.

the Court to scrutinize carefully each appraiser's approach to this engagement. Several notable differences emerge. On a comp in Sedgwick (the "13401 Property"), Vanderweg began with a sales price of $124,000 and added and subtracted adjustments to match the subject property. Sedgwick is 13 miles from debtors' home. Vanderweg concluded that this home had an adjusted value of $140,140. In reaching that conclusion, he subtracted from its value an imputed seller's concession of $7,860.[16] He explained that on FHA-financed sales, where buyers are typically short of cash, sellers will increase the price of the home by a sufficient amount to advance closing costs. This concession is more than 6 per cent of the sale price of $124,000. Both he and Goodson testified that a typical FHA concession never exceeds 4 per cent which, in this comp's case, would have been $4,960 or $2,900 less than the adjustment. Goodson testified that the industry standard requires applying no more than $4,500 of seller concessions in adjusting comparable sales. When she used the 13401 Property for one of her comps, she took no seller's concession adjustment.

As noted above, Goodson did not deduct value from the Hochs' property on account of the "illegal use." Instead, she valued the bungalow at $30,000 as opposed to Vanderweg's $20,000 value. This affects their adjustments to comps under the category of "2nd House/other buildings." Thus, where Vanderweg added $20,000 in adjusting the value of the 13401 Property for the bungalow, Goodson added $25,000 for the bungalow after adjusting for a pole shed (valued at $5,000) located on the 13401 Property. She concluded that the adjusted value of 13401 Property, her lowest valued comp, was $149,000.

---

[16] It is unclear what the seller's concessions were for this comp. Goodson made no adjustments for sale/financing concession because she did not have the information. Vanderweg testified he obtained the MLS and he believed concessions were approximately $10,000 or 12-13% of the sales price. 12%-13% of $124,000 is $14,880- $16,120. He also testified that the $7,860 figure was 3/4 of the actual concession, which would make it $10,480.

8

Also telling is the appraisers' shared use of a comp on East Lake (the "East Lake Property"). This home is on a hill that is within a quarter mile of East Lake. It had a sales price of $165,000. Vanderweg took two deductions from its value: one for $5,000 for the difference between its condition and the Hoch's residence, and the other for $10,000 for a lake view. Goodson testified that she had appraised this house at the time of its last sale and that there was no difference in its condition. She further stated that the view's value was significantly exaggerated. She found this property to have an adjusted value of $178,300 while Vanderweg assessed its value at $153,900, a substantial difference.

If one modifies Vanderweg's adjustments to recognize the value of the bungalow at $30,000, an increase of $10,000 and limit the seller's concessions as Goodson described, the adjusted value of the 13401 Property would be $152,500.[17] Likewise, if the Court removes the condition and lake view adjustments from Vanderweg's adjustments on the East Lake Property, that value rises to $168,900. These adjustments cast considerable doubt on the debtors' proposed value of $140,000.

Conclusions

The Debtors did not meet their burden of proving that the value of their homestead is less than the amount of their first mortgage. This Court finds Goodson's appraisal and testimony more persuasive than that of Vanderweg. This Court concludes that the homestead is worth more than the first mortgage balance of $146,374.30 for the reason set forth above. The Court also notes that less than a year ago, the Hochs undertook to borrow $10,000 more than is currently owed on this

---

[17] Vanderweg's adjusted value for the 13401 Property is $140,140. The Court adds $10,000, the difference in Goodson's and Vanderweg's appraisal of the bungalow. The Court also adds the difference between the "standard" FHA concession of $4,500 and the concession adjustment of $7,860, or $2,360. $140,140+$10,000+$2,360=$152,500.

9

property. At that time, they apparently believed that it was worth more than $175,000. While there can be no doubt that the market has changed in the ensuing twelve months, no evidence adduced at the hearing or this Court's understanding of the central Kansas real estate market suggested that home values in this area have declined by 20 per cent. The debtors' motion to strip lien is therefore DENIED. Debtors will file an amended plan consistent with the forgoing within 21 days of the entry of this order.

# # #